**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH DAKOTA**

**TREVOR KOPROWICZ AND DANIEL NOLTING**, individually and on behalf of all others similarly situated,

Plaintiff,

v.

**CLIFF VIESSMAN, INC. D/B/A VIESSMAN TRUCKING,**

Defendant.

Case No. 1:25-cv-1014

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

**PLAINTIFFS' CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Trevor Koprowicz and Daniel Nolting ("Plaintiffs"), each individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendant Cliff Viessman, Inc. d/b/a Viessman Trucking ("Viessman" or "Defendant"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

## I. INTRODUCTION

1. This class action arises out of the recent data security incident and data breach that was perpetrated against Defendant (the "Data Breach"), which held in its possession certain personally identifiable information ("PII", "the "Private Information") of its current and former employees and independent contractors, the putative class members ("Class"). This Data Breach was discovered on or around February 4, 2025.

2. Cliff Viessman, Inc. is a major, family-owned trucking company based in Gary, South Dakota.[1]

3. Plaintiffs and Class Members are current and former employees and independent contractors of Defendant, as well as dependents of current or former employees and drivers for CVI, and customers of CVI ("Class Members" or "the Class").

4. The Private Information was acquired by cyber-criminals who perpetrated the attack and remains in the hands of those cyber-criminals.

5. According to Defendant's report to the Office of the Maine Attorney General, 3,164 total individuals' Private Information was impacted in the breach.[2]

6. The Data Breach resulted from Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which they were entrusted for either treatment or employment or both.

7. Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that they collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information was subjected to unauthorized access by an unknown third party and precisely what specific type of information was accessed.

8. Defendant knowingly maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private

[1]https://viessmantrucking.com/our-story/(last visited September 22, 2025).
[2] Office of the New Hampshire Attorney General *available at* https://mm.nh.gov/files/uploads/doj/remote-docs/cliff-viessman-20250910.pdf (*last accessed* September 22, 2025).

Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

9. Defendant, through its employees, disregarded the rights of Plaintiffs and Class Members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions. Defendant also failed to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information and failed to take standard and reasonably available steps to prevent the Data Breach.

10. In addition, Defendant's employees failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant's employees (presumably in the IT department) properly monitored its property, it would have discovered the intrusion sooner.

11. Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

12. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes. These crimes include opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police

during an arrest.

13. Because of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

14. Plaintiffs and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

15. Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves, and all similarly situated individuals whose Private Information was accessed during the Data Breach.

16. Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

17. Accordingly, Plaintiffs sue Defendant seeking redress for their unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of implied contract; and (iii) unjust enrichment.

## II. PARTIES

18. Plaintiff Trevor Koprowicz is an individual domiciled in North Mankato, Minnesota. Plaintiff Koprowicz received a Notice of Data Event Letter ("Notice Letter") from Defendant advising him that his Social Security number was accessed and copied during the Data Breach.

19. Plaintiff Daniel Nolting is an individual domiciled in Ortonville, Minnesota. Plaintiff Nolting received a Notice Letter from Defendant advising him that his name, Social

Security number, and date of birth were accessed and copied during the Data Breach.

20. Defendant Cliff Viessman, Inc. is a transportation corporation specializing in food hauling. Defendant's principal place of business is 215 Main St, Gary, SD 57237. Defendant's registered agent for service of process is Wayne Viessman, 215 Main St, Gary, SD 57237.

## III. JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred putative Class Members, and minimal diversity exists because many putative Class Members are citizens of a different state than Defendant, including Plaintiffs.

22. This Court has personal jurisdiction over Defendant because Defendant is registered to do business in the State of South Dakota; has its principal place of business in this District; conducts substantial business in this District through its headquarters, offices, and affiliates; engaged in the conduct at issue here in this District; and/or otherwise has substantial contacts with this District and purposely availed itself to the Courts in this District.

23. Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District.

## IV. FACTUAL ALLEGATIONS

### *Defendant's Business*

24. CVI is a trucking company hauling food-grade bulk products founded in 1961.[3]

25. CVI is family owned and operated with its headquarters in Gary, SD, and terminals

[3] *Our Story*, CVI, https://viessmantrucking.com/our-story/ (last visited September 22, 2025).

in: Cedar Rapids, IA; Dawson, MN; Mankato, MN; Marshall, MN; Paynesville, MN; Renville, MN; Columbus, NE; Wahpeton, ND; Dayton, OH; Waterton, `SD; Memphis, TN; and Manitowoc, WI.[4]

26. Viessman Trucking has two subsidiaries, Jacobson Transport and Johnsrud Transport, in all CVI generated $41.5 million in revenue in 2024.[5] In other words, CVI could have afforded to implement adequate data security prior to the Breach but deliberately chose not to.

27. In the ordinary course of business, CVI receives the Private Information from individuals, such as Plaintiffs and the Class, who are employed or doing contract work for CVI.

28. CVI obtains, collects, uses, and derives a benefit from the Private Information of Plaintiffs' and Class Members. CVI uses the Private Information it collects to provide services, making a profit therefrom. CVI would not be able to obtain revenue if not for the acceptance and use of Plaintiffs' and the Class's Private Information.

29. In the ordinary course of business, Defendant's employees and independent contractors are encouraged and/or are mandated to provide the Defendant (and Plaintiffs did provide) with sensitive, personal, and private information, such as his or her:

a. name,

b. date of birth,

c. social security numbers, and

d. driver's license numbers.

30. Defendant stored this Private Information in its information technology computer systems and servers, on information and belief located at its principal place of business in Gary, S.D.

---

[4] *Id.*

[5] https://www.konaequity.com/company/cliff-viessman-inc-4391279132/

31. By collecting Plaintiffs' and the Class's Private Information, CVI assumed legal and equitable duties to Plaintiffs and the Class to protect and safeguard their Private Information from unauthorized access and intrusion.

32. Under information and belief, CVI provides Plaintiffs and Class Members a copy of the privacy policy prior to entering into a contract for employment and/or contract work.

33. CVI's assurances of maintaining high standards of cybersecurity make it evident that CVI recognized it had a duty to use reasonable measures to protect the PII that it collected and maintained.

34. CVI violated its own statements and failed to adopt reasonable and appropriate security practices and procedures including administrative, physical security, and technical controls to safeguard Plaintiffs' and the Class's Private Information.

35. As a result, Plaintiffs' and Class Members' Private Information was accessed and stolen from CVI's inadequately secured data systems in a massive and preventable Data Breach.

36. Defendant agreed to and undertook legal duties to maintain confidentiality of the personal information entrusted to it by Plaintiffs and Class Members safely, confidentially, and in compliance with all applicable laws.

37. The Private Information held by Defendant in its computer system and network included the Private Information of Plaintiffs and Class Members.

***The Data Breach***

38. A Data Breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Defendant.

39. On or about September 10, 2025, Defendant informed the New Hampshire Attorney

General's Office about a "Notice of Data Security Incident"[6] that stated in part:

> On August 5, 2025, CVI detected suspicious activity within its network environment. Upon becoming aware, CVI immediately took steps to lock down and secure its network and engaged third-party cybersecurity specialists to conduct a forensic investigation into the nature and scope of the Event. Through the investigation, it was determined that an unauthorized party had gained access to certain systems on CVI's network and, during that time, copied files stored on some of those systems.

40. Within this notice, Defendant failed to state whether it was able to contain or end the cybersecurity threat, leaving victims to fear whether the Private Information that Viessman continues to maintain is secure. Defendant also failed to state how the breach itself occurred. All this information is vital to victims of a data breach, let alone a data breach of this magnitude due to the sensitivity and wide array of information compromised in this specific breach.

41. Defendant had obligations created by contract, industry standards, state law, common law, and representations made to Class Members, to keep Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

42. Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with their obligations to keep such information confidential and secure from unauthorized access.

43. Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

44. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

---

[6] Exhibit A

***DATA BREACHES ARE PREVENTABLE***

45. "One of the biggest issues with paying a ransom is that you're gambling that hackers will keep to their word and restore systems. Unfortunately, when you're dealing with criminals, there's no guarantee. In fact, it's estimated that as many as 92 percent of firms fail to recover all of their data, with nearly a third losing at least half. If the hackers have successfully exfiltrated data as part of their attack, there's also no way of knowing what they'll do with this, even if a ransom is paid. Many cybergangs make additional revenue by selling the data on the dark web, especially if it contains valuable intellectual property or customer data."[7]

46. In recognition of the severity of the Data Breach, and the imminent risk of harm Plaintiffs and the Class face, CVI provided temporary credit monitoring and identity theft protection services. Such an offering is inadequate and will not prevent identity theft but will only alert Data Breach victims once identity theft has already occurred.

47. All in all, CVI failed to take the necessary precautions required to safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access and exploitation.

48. Defendant's actions represent a flagrant disregard of the rights of Plaintiffs and the Class, both as to privacy and property.

49. Defendant failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

50. Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private

---

[7] Brenda Robb, *Should You Pay a Ransomware Demand?*, BLACKFOG (Feb. 28, 2024) https://www.blackfog.com/should-you-pay-a-ransomware-demand/ (last visited September 22, 2025).

Information.

51. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[8]

52. To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

> - Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
>
> - Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
>
> - Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
>
> - Configure firewalls to block access to known malicious IP addresses.
>
> - Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
>
> - Set anti-virus and anti-malware programs to conduct regular scans automatically.
>
> - Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
>
> - Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files,

---

8 How to Protect Your Networks from RANSOMWARE, at 3, available at: https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited September 22, 2025).

directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[9]

53. To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

[9] *Id.* at 3-4.

> **<u>Build credential hygiene</u>**
> - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;
>
> **<u>Apply principle of least-privilege</u>**
> - Monitor for adversarial activities
> - Hunt for brute force attempts
> - Monitor for cleanup of Event LogsAnalyze logon events;
>
> **<u>Harden infrastructure</u>**
> - Use Windows Defender Firewall
> - Enable tamper protection
> - Enable cloud-delivered protection
> - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[10]

54. Given that Defendant was storing the Private Information of its current and former employees and independent contractors Defendant could and should have implemented all the above measures to prevent and detect cyberattacks.

55. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiffs and Class Members.

***DEFENDANT ACQUIRES, COLLECTS & STORES MEMBERS' PRIVATE INFORMATION***

56. Defendant acquires, collects, and stores a massive amount of Private Information on its current and former employees and independent contractors.

57. As a condition of becoming an employee or independent contractor of Defendant, Defendant requires all employees and independent contractors to entrust it with highly sensitive personal information and protected health information.

---

[10] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last viewed September 22, 2025).

58. By obtaining, collecting, and using Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

59. Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendant absent a promise to safeguard that information.

60. Upon information and belief, while collecting Private Information from employees and independent contractors, including Plaintiffs, Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

61. Plaintiffs and the Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***Value Of Private Information***

62. Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breach can and will be used in a variety of ways by criminals to exploit Plaintiffs and the Class Members and to profit off their misfortune.

63. Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[11]

64. The Federal Trade Commission ("FTC") defines identity theft as "a fraud

[11] *Facts + Statistics: Identity Theft and Cybercrime*, INSURANCE INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

committed or attempted using the identifying information of another person without authority."[12]The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[13]

65. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[14]

66. For example, Personal Information can be sold at a price ranging from $40 to $200.[15] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[16]

67. Social security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> **Social Security number.** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[17]
> (Emphasis added).

---

[12] 17 C.F.R. § 248.201 (2013).
[13] *Id.*
[14] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last viewed September 22, 2025)
[15] *Here's How Much Your Personal Information Is Selling for on the Dark Web,* Experian, Dec. 6, 2017, available at: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last viewed Septempber 22, 2025)
[16] *In the Dark, VPNOverview, 2019,* available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last viewed September 22, 2025)
[17] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

68. Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it for years.[18]

69. This was a financially motivated Breach, as the only reason cybercriminals go through the trouble of running targeted cyberattacks against companies like CVI is to get ransom money and/or information that they can monetize by selling on the dark web for use in the kinds of criminal activity described herein.

70. Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[19]

71. "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[20]

72. These risks are both certainly impending and substantial. As the Federal Trade Commission ("FTC") has reported, if hackers get access to PII, ***they will use it***.[21]Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

73. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be

---

[18] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, available at https://www.gao.gov/products/gao-07-737.

[19] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web* (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

[20] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[21] Ari Lazarus, *How fast will identity thieves use stolen info?*, MILITARY CONSUMER (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info.

> held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[22]

74. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

***DEFENDANT FAILS TO COMPLY WITH FTC GUIDELINES***

75. The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

76. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[23] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[24]

77. The FTC further recommends that companies not maintain PII longer than is

---

[22] *Report to Congressional Requesters,* GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited September 22, 2025)

[23] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited September 22, 2025).

[24] *Id.*

needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

78. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

79. Defendant failed to properly implement basic data security practices.

80. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees and independent contractors' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

81. Defendant was always fully aware of its obligation to protect the PII of its employees and independent contractors. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***DEFENDANT FAILS TO COMPLY WITH INDUSTRY STANDARDS***

82. As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

83. Several best practices have been identified that a minimum should be implemented by healthcare providers like Defendant, including, but not limited to, educating all employees;

using strong passwords; creating multi-layer security, including firewalls, antivirus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

84. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

85. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including, without limitation, PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

86. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

## V. DEFENDANT'S BREACH

87. Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect employees and customers' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to train employees in the proper handling of emails containing malicious software, and to and maintain adequate email security practices;

e. Failing to put into place proper procedures, software settings, and data security software protections to adequately protect against a blunt force intrusion;

f. Failing to comply with FTC guidelines for cybersecurity, in violation of Section *5* of the FTC Act; and

g. Failing to adhere to industry standards for cybersecurity.

88. As the result of computer systems needing security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

89. Plaintiffs and Class Members now face an increased risk of fraud and identity theft.

***PLAINTIFFS AND THE CLASS MEMBERS HAVE AND WILL EXPERIENCE SUBSTANTIAL HARM***

90. Plaintiffs and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

91. Although, this cyberattack has not been claimed by a ransomware gang, it is the modus operandi of cybercriminals to sell or disclose private information once it has been stolen from an entity.

92. Thus, the ramifications of Defendant's failure to keep Plaintiffs' and the Class's PII secure are severe.

93. Identity theft occurs when someone uses another's personal information such as

that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes. According to experts, one out of four data breach notification recipients become a victim of identity fraud.

94. Because of Defendant's failures to prevent—and to timely detect—the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

- The loss of the opportunity to control how their PII is used;
- The diminution in value of their PII;
- The compromise and continuing publication of their PII;
- Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;
- Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;
- Delay in receipt of tax refund monies; Unauthorized use of stolen PII; and
- The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

95. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

96. The value of Plaintiffs' and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals often post stolen

private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

97. It can take victims years to spot identity or PII theft, giving criminals plenty of time to abuse that information for money.

98. One such example of criminals using PII for profit is the development of "Fullz" packages.

99. Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

100. The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII is being misused, and that such misuse is traceable to the Data Breach.

101. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims, and the

numbers are only rising.

102. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good" Defendant did not rapidly report to Plaintiffs and the Class that their PII had been stolen.

103. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

104. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

105. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

106. The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[25]

107. The FTC has also issued many guidelines for businesses that highlight the

[25] Statement of FTC Commissioner Pamela Jones Harbour-Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009).(last visited September 22, 2025).

importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires:

- encrypting information stored on computer networks;
- retaining payment card information only as long as necessary;
- properly disposing of personal information that is no longer needed;
- limiting administrative access to business systems;
- using industry-tested and accepted methods for securing data;
- monitoring activity on networks to uncover unapproved activity;
- verifying that privacy and security features function properly;
- testing for common vulnerabilities; and
- updating and patching third-party software.

108. According to the FTC, unauthorized PII disclosures ravage consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[26] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

109. Defendant's failure to properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

110. Plaintiffs and Class Members now face an increased risk of fraud and identity theft.

---

[26] *See Taking Charge, What to Do If Your Identity is Stolen,* FTC, at 3 (2012), available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited September 22, 2025).

***DATA BREACHES PUT CONSUMERS AT AN INCREASED RISK OF FRAUD AND IDENTITY THEFT***

111. Data Breaches such as the one experienced by Defendant's employees and independent contractors are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

112. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[27]

113. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (possibly an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[28]

114. Identity thieves use stolen personal information such as Social Security numbers for various crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

115. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give

---

[27] U.S. Government Accountability Office, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf (last visited September 22, 2025) ("GAO Report").
[28] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited September 22, 2025).

the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

116. PII is a valuable property right.[29] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

117. Theft of Private Information is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[30] Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

118. It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that

---

[29] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[30] *See* Federal Trade Commission, *Medical Identity Theft*, *available at* http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited September 22, 2025).

> attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.
>
> *See* GAO Report, at p. 29.

119. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

120. There is a strong probability that all the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

121. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[31] PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

122. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for more credit lines.[32] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[33]

123. Each of these fraudulent activities is difficult to detect. An individual may not know

---

[31] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), *available at* https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited September 22, 2025).

[32] Social Security Administration, *Identity Theft and Your Social Security Number* (2018), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited September 22, 2025)

[33] *Id* at 4.

that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

124. It is also hard to change or cancel a stolen Social Security number.

125. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[34]

126. This data, as one would expect, demands a much higher price on the black market. The National Association of Healthcare Access Management reports, "[p]ersonal medical data is said to be more than ten times as valuable as credit card information."[35]

127. Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, coveted Social Security numbers were selling on the dark web for just $1 in 2016—the same as a Facebook account. That pales in comparison with the asking price for medical data, which was selling for $300 and up.[36]

128. In recent years, the transportation industry has experienced disproportionally higher numbers of data theft events than other industries. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial

---

[34] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (February 9, 2015), *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited September 22, 2025).

[35] Laurie Zabel, *The Value of Personal Medical Information: Protecting Against Data Breaches*, NAHAM Connections, *available at* https://www.naham.org/page/ConnectionsThe-Value-of-Personal-Medical-Information (last visited September 22, 2025).

[36] Paul Ducklin, *FBI "ransomware warning" for healthcare is a warning for everyone!*, Sophos (Oct. 29, 2020) *available at* https://news.sophos.com/en-us/2020/10/29/fbi-ransomware-warning-for-healthcare-is-a-warning-for-everyone/ (last visited Septempber 22, 2025).

and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## VI. Plaintiffs' Individual Experiences

***Plaintiff Trevor Koprowicz***

129. Plaintiff Koprowicz is a former employee of CVI.

130. Plaintiff Koprowicz provided his Private Information to Defendant as a condition of his employment which was then entered into Defendant's computer system and maintained by Defendant.

131. Plaintiff Koprowicz reasonably understood and expected that Defendant would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff Koprowicz would not have allowed Defendant, or anyone in Defendant's position, to maintain his Private Information if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

132. Plaintiff Koprowicz received a Notice Letter dated September 10, 2025, from Defendant informing him that his Private information had been viewed and copied by an unauthorized actor.

133. Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Koprowicz faces, Defendant offered him a twelve-month subscription to a credit monitoring service. The Notice Letter Plaintiff Koprowicz received also cautioned him to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your credit reports for suspicious activity.

134. Plaintiff Koprowicz greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff Koprowicz is very concerned about identity theft and fraud, as well as the consequences of such identity theft

and fraud resulting from the Data Breach.

135. As a consequence of and following the Data Breach, Plaintiff Koprowicz has suffered spam emails and text messages suggesting that his Private Information is now in the hands of cybercriminals. Specifically, Plaintiff Koprowicz has received text messages regarding personal loans he did not apply for, and unknown attempted logins to his social media accounts (i.e., *Facebook*).

136. Once an individual's Private Information is for sale and access on the dark web, as Plaintiff's Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[37] On information and belief, Plaintiff's phone number was also compromised as a result of the Data Breach.

137. Plaintiff Koprowicz stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

138. To the best of Plaintiff Koprowicz's knowledge, his PII has not been compromised in a prior data breach.

139. As a result of the Data Breach, Plaintiff Koprowicz has spent hours researching the Data Breach, verifying the legitimacy of the Notice Letter, reviewing his bank accounts, monitoring his credit report, signing up for Defendant's abbreviated credit monitoring services, and other necessary mitigation efforts. This is valuable time that Plaintiff Koprowicz spent at Defendant's direction and that he otherwise would have spent on other activities, including but not

[37] Ryan Toohil, *What do Hackers do with Stolen Information*, AURA, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited Mar. 21, 2025).

limited to work and/or recreation.

140. The Data Breach has caused Plaintiff Koprowicz to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in noticing him of the fact that his Private Information was acquired by criminals as a result of the Data Breach.

141. Plaintiff Koprowicz anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Koprowicz will continue to be at present and continued increased risk of identity theft and fraud for years to come.

142. Plaintiff Koprowicz has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future data breaches.

143. Plaintiff Koprowicz has suffered injuries directly and proximately caused by the Data Breach, including: (i) theft of Plaintiff Koprowicz's valuable Private Information; (ii) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Koprowicz's Private Information being placed in the hands of cybercriminals; (iii) damages to and/or diminution in value of Plaintiff Koprowicz's Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (iv) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff Koprowicz should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff Koprowicz's Private Information; and (v) continued risk to Plaintiff Koprowicz's Private Information, which remains in the possession of Defendant and which is subject to further breaches

so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

***Plaintiff Daniel Nolting***

144. Plaintiff Nolting is a former driver of CVI's subsidiary Jacobson Transport and a former driver for of CVI.

145. Plaintiff Nolting provided his Private Information to Defendant as a condition of him obtaining a contract for driving for CVI which was then entered into Defendant's computer system and maintained by Defendant.

146. Plaintiff Nolting reasonably understood and expected that Defendant would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff Nolting would not have allowed Defendant, or anyone in Defendant's position, to maintain his Private Information if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

147. Plaintiff Nolting received a Notice Letter dated September 10, 2025, from Defendant informing him that his Private information had been viewed and copied by an unauthorized actor.

148. Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Nolting faces, Defendant offered him a twelve-month subscription to a credit monitoring service. The Notice Letter Plaintiff Nolting received also cautioned his to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your credit reports for suspicious activity.

149. Plaintiff Nolting greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff Nolting is

very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

150. As a consequence of and following the Data Breach, Plaintiff Nolting has suffered increased daily spam calls and text messages; substantial amounts of spam emails related to loan approvals and a range of different services. He also suffered from unknown attempted logins to his accounts.

151. Plaintiff Nolting stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

152. To the best of Plaintiff Nolting's knowledge, his PII has not been compromised in a prior data breach.

153. As a result of the Data Breach, Plaintiff Nolting has spent hours researching the Data Breach, verifying the legitimacy of the Notice Letter, reviewing his bank accounts, monitoring his credit report, signing up for Defendant's abbreviated credit monitoring services, and/or other necessary mitigation efforts. This is valuable time that Plaintiff Nolting spent at Defendant's direction and that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

154. The Data Breach has caused Plaintiff Nolting to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in noticing him his Private Information was acquired by criminals as a result of the Data Breach.

155. Plaintiff Nolting anticipates spending considerable time and money on an ongoing

basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Nolting will continue to be at present and continued increased risk of identity theft and fraud for years to come.

156. Plaintiff Nolting has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future data breaches.

157. Plaintiff Nolting has suffered injuries directly and proximately caused by the Data Breach, including: (i) theft of Plaintiff Nolting's valuable Private Information; (ii) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Nolting's Private Information being placed in the hands of cybercriminals; (iii) damages to and/or diminution in value of Plaintiff Nolting's Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (iv) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff Nolting should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff Nolting's Private Information; and (v) continued risk to Plaintiff Nolting's Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

## VII. PLAINTIFFS AND CLASS MEMBERS DAMAGES

158. To date, Defendant has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited

to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered inadequate identity monitoring services, despite Plaintiffs and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

159. The credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. What's more, Defendant places the burden on Plaintiffs and Class Members by requiring them to expend time signing up for that service rather than automatically enrolling all victims of this Data Breach.

160. Defendant's credit monitoring advice to Plaintiffs and Class Members places the burden on Plaintiffs and Class Members, rather than on Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach.

161. Plaintiffs and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

162. Plaintiffs' Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

163. Plaintiffs were damaged in that their Private Information is in the hands of cyber criminals.

164. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

165. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class

Members have been forced to expend time dealing with the effects of the Data Breach.

166. Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

167. Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

168. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

169. Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

170. Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

171. Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Addressing their inability to withdraw funds linked to compromised accounts;

e. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f. Placing "freezes" and "alerts" with credit reporting agencies;

g. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h. Contacting financial institutions and closing or modifying financial accounts;

i. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j. Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

172. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

173. Further, because of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

174. As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VIII. CLASS REPRESENTATION ALLEGATIONS

175. Plaintiffs incorporate by reference all preceding paragraphs as if fully restated here.

176. Plaintiffs bring this action against CVI on behalf of themselves and all other individuals similarly situated under Federal Rule of Civil Procedure 23. Plaintiffs assert all claims on behalf of a nationwide class (the "Class") defined as follows:

> **All individuals who were sent a Notice Letter from CVI and whose Private Information was accessed and/or acquired in the Data Breach.**

177. Excluded from the Class is Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

178. Plaintiffs reserve the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

179. Plaintiffs anticipate the issuance of notice setting forth the subject and nature of the instant action to the proposed Class. Upon information and belief, Defendant's own business records or electronic media can be utilized for the notice process.

180. The proposed Class meets the requirements of Federal Rule of Civil Procedure 23.

181. **Numerosity:** The proposed Class is so numerous that joinder of all members is impracticable. The Class is comprised of over 3,000 individuals.

182. **Typicality:** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all members of the Class were injured through CVI's uniform misconduct. CVI's inadequate data security gave rise to Plaintiffs' claims and are identical to those that give rise to the claims of every other Class Member because Plaintiffs and each member of the Class had their sensitive Private Information compromised in the same way by the same conduct of CVI.

183. **Adequacy:** Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the Class; Plaintiffs have retained counsel competent and highly experienced in data breach class action litigation; and Plaintiffs and Plaintiffs' counsel

intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

184. **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for members of the Class individually to effectively redress CVI's wrongdoing. Even if Class Members could afford such individual litigation, the Court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

185. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

186. Whether Defendant engaged in the wrongful conduct alleged herein;

187. Whether Defendant failed to adequately safeguard Plaintiffs' and the Class's Private Information;

188. Whether Defendant owed a duty to Plaintiffs and the Class to adequately protect their Private Information, and whether it breached this duty;

189. Whether CVI breached its duties to Plaintiffs and the Class;

190. Whether CVI failed to provide adequate cyber security;

191. Whether CVI knew or should have known that its computer and network security systems were vulnerable to cyberattacks;

192. Whether CVI's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its company network;

193. Whether CVI was negligent in permitting unencrypted Private Information off vast numbers of individuals to be stored within its network;

194. Whether CVI was negligent in failing to adhere to reasonable retention policies, thereby greatly increasing the size of the Data Breach;

195. Whether CVI breached implied contractual duties to Plaintiffs and the Class to use reasonable care in protecting their Private Information;

196. Whether CVI failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and the Class;

197. Whether CVI continues to breach duties to Plaintiffs and the Class;

198. Whether Plaintiffs and the Class suffered injury as a proximate result of CVI's negligent actions or failures to act;

199. Whether Plaintiffs and the Class are entitled to recover damages, equitable relief, and other relief; and

200. Whether CVI's actions alleged herein constitute gross negligence, and whether Plaintiffs and Class Members are entitled to punitive damages.

## IX. CAUSES OF ACTION

### FIRST COUNT
### NEGLIGENCE
### (On Behalf of Plaintiffs and All Class Members)

201. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

202. Defendant required Plaintiffs and Class Members to submit non-public personal information as a condition of employment.

203. By collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's

duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

204. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

205. Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and its employees and independent contractors, which is recognized by laws and regulations, as well as common law. Defendant could ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

206. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

207. Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

208. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect timely that Class Members' Private Information had been compromised;

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g. Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

209. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the transportation industry.

210. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

211. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

212. Defendant's negligent conduct is ongoing, in that they still hold the Private Information of Plaintiffs and Class Members in an unsafe and unsecure manner.

213. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**SECOND COUNT**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and All Class Members)**

214. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

215. When Plaintiffs and Class Members provided their Private Information to Defendant in exchange for employment, they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information.

216. Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

217. In entering such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant federal and state laws and regulations and adhered to industry standards.

218. Plaintiffs and Class Members paid money to Defendant or provided labor to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

219. Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

220. Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

221. Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

222. Defendant breached its implied contracts with Class Members by failing to

safeguard and protect their Private Information.

223. As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

224. Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

225. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**THIRD COUNT**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and All Class Members)**

226. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

227. Plaintiffs bring this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of implied contract count above.

228. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

229. As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the portion of each payment made that is allocated to data security is known to Defendant.

230. Plaintiffs and Class Members conferred a monetary benefit on Defendant. Defendant's acceptance and storage of Plaintiffs' and the other Class members' Private Information created a fiduciary relationship between Defendant on the one hand, and Plaintiffs and the other Class members, on the other hand. In light of this relationship, Defendant must act

primarily for the benefit of its employees and independent contractors, which includes safeguarding and protecting Plaintiffs' and the other Class members' Private Information.

231. Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

232. Defendant enriched itself by saving the costs Defendant reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Rather than providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by using cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

233. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

234. Defendant failed to secure Plaintiffs' and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiffs and Class Members provided.

235. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices alleged.

236. If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

237. Plaintiffs and Class Members have no adequate remedy at law.

238. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to:

a. actual identity theft;

b. the loss of the opportunity of how their Private Information is used;

c. the compromise, publication, and/or theft of their Private Information;

d. out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information;

e. lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

f. the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and

g. future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiffs and Class Members.

239. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

240. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

## X. PRAYER FOR RELIEF

241. WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above

seek the following relief:

a. For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiffs and their counsel to represent the Class, and finding that Plaintiffs are proper representatives of the Class requested herein;

b. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c. For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

e. Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiffs and the Class;

f. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g. For an award of punitive damages, as allowable by law;

h. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i. Pre- and post-judgment interest on any amounts awarded; and

j. Any other relief that this court may deem just and proper.

## XI. JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: September 23, 2025

*/s/ Brett Waltner*
Brett Waltner
Myers Billion, LLP
230 S. Phillips Ave. Ste. 300
Sioux Falls, SD 57104
Tel: (605) 336-3700
bwaltner@myersbillion.com

Benjamin J. Eisner*
Texas Bar No. 24124680
**EKSM, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931
Fax: (888) 276-3455
service@eksm.com

**COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS**

(* denotes *pro hac vice* forthcoming)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

TREVOR KOPROWICZ and DANIEL NOLTING, individually and on behalf of all others similarly situated

**(b)** County of Residence of First Listed Plaintiff: Nicollet County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Brett Waltner, Myers Billion, LLP, 230 S. Phillips Ave. Ste. 300, Sioux Falls, SD 57104; (605) 336-3700

**DEFENDANTS**

CLIFF VEISSMAN, INC. d/b/a VEISSMAN TRUCKING

County of Residence of First Listed Defendant: Deuel County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☒ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
28 U.S.C. Sec. 1332(d)(2)

Brief description of cause:
Defendant suffered a data breach, which damaged a class of individuals whose personal information was stolen.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $** 10,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE: Sep 18, 2025

SIGNATURE OF ATTORNEY OF RECORD: /s/ Brett Waltner

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.